IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:15-CR-10182-RWZ |
| | ) | |
| ORISTEL SOTO-PEGUERO and | ) | |
| LUIS F. GUZMAN-ORTIZ | | |

## GOVERNMENT'S POST-HEARING BRIEF IN RESPONSE TO DEFENDANTS' MOTION TO SUPPRESS

**The Charges**

The defendant Oristel Soto-Peguero is charged with two counts of possessing heroin with intent to distribute, two counts of conspiring to distribute heroin, one count of illegal possession of a firearm, and one count of using and discharging a firearm during and in relation to a drug trafficking offense, in violation of 21 U.S.C. §§ 846 and 841(a)(1); and 18 U.S.C. § 922(g) and 924(c). The defendant Luis F. Guzman-Ortiz is charged is charged with one count of possessing heroin with intent to distribute, and one count of conspiring to distribute heroin, in violation of 21 U.S.C. §§ 846 and 841(a)(1).

**Summary**

From January through July of 2015, agents of the Drug Enforcement Administration (DEA) conducted a wiretap investigation of Eddyberto Mejia-Ramos, a Taunton heroin trafficker. By July, the intercepted communications revealed that Soto-Peguero and his girlfriend, co-defendant Mercedes Cabral, regularly supplied heroin to Mejia-Ramos. Both were then living at 632 Norwest Lane in Norwood, MA.

**On July 6, 2015**, intercepted calls revealed that Soto-Peguero planned to send Cabral to

1

deliver suspected heroin to Mejia-Ramos that evening.   **At 9:38 pm**, Soto-Peguero told Mejia-Ramos she was on her way.   At the same time, surveillance agents observed Cabral drive a rented Hyundai Sonata from Norwood towards Taunton.   To facilitate and disguise the ongoing investigations, agents contacted Massachusetts State Police (MSP) Troopers Jason Vital and Ryan Walczak to conduct a car stop.   They stopped the car, arrested Cabral, searched the vehicle, and recovered a kilogram of heroin.

As a result, agents decided to freeze the Norwood apartment and seek a federal search warrant.   Agents knocked and announced their presence three times, without response.   As they began to ram the door to gain entry, a gunshot tore through the front door.   Officers took cover, but eventually gained entrance through the rear.   After clearing the first floor, they called up for anyone else in the apartment to surrender themselves.   Soto-Peguero and Luis Guzman-Ortiz complied, and were arrested.   Officers then conducted a security sweep of the upstairs, and found no other individuals.   They did, however, observe two kilograms of heroin, one of which was in the heating duct in the front bedroom.   An officer moved the kilogram slightly, to reveal a firearm underneath.   Officers thereupon secured the apartment and awaited authorization to conduct a thorough search.   Special Agent Carl Rideout obtained a federal warrant the next morning, and officers then fully searched the apartment.   They recovered the two kilograms of heroin and the loaded firearm, as well as extensive additional evidence.

**Motion Arguments**

The defendant Soto-Peguero moves to suppress the wiretap evidence on the ground that agents failed to establish necessity in their application for authority to intercept communications occurring over Mejia-Ramos's phones.   He also seeks to suppress the heroin and other evidence

recovered from the Sonata on the additional ground that the car stop was not justified by the marked lane violation noted in the MSP report, and that the inventory search was a pretext for an investigative search that required a warrant.   Finally, both defendants seek to suppress the fruits of the searches of the apartment on the ground that the first search was not justified by exigent circumstances and went beyond the bounds of a protective sweep, and that the second was tainted by the first.

These claims are without merit.   Chief Judge Saris properly found, based on the affidavits of SA Rideout, that investigators sufficiently established necessity as required by the statute.   The car stop was based on probable cause, and therefore fell squarely within the automobile exception to the warrant requirement.   The entry into 632 Norwest Lane was lawful, because agents had sufficient justification to freeze the Norwood apartment both at the outset, and after the shot was fired.   At the outset, the attempted entry was justified following the arrest of Cabral and seizure of the kilogram of heroin, because agents legitimately feared that the defendant would destroy evidence.   Prior to gaining entry, Soto-Peguero fired a handgun and the bullet pierced the front door.   This event clearly justified emergency entry to disarm the shooter and protect the public.   Moreover, the doctrine of inevitable discovery is applicable in these circumstances, because the evidence shows agents would have sought and obtained a valid search warrant, and therefore would have recovered the evidence, whether or not they froze the apartment.

## FACTS

The facts are set forth in the exhibits submitted with the defendant Soto-Peguero's motion to suppress (Defendant's Exhibits), the Transcript of the Suppression Hearing on Day

One and Day Two (Tr. 1 and Tr. 2), and the Exhibits offered by the Government at the hearing

(G. Ex.), unless otherwise noted.   The Facts are organized in three sections: I. Necessity; II.

Car Stop; III. Exigent Circumstances and Inevitable Discovery.

## I.     NECESSITY

**Wiretap Affidavits Reveal that DEA Adequately Showed Wiretaps Were Necessary**

**to Accomplish the Objectives of the Investigation.**   The defendant Soto-Peguero contends that

"the Government failed to make a good faith effort to exhaust other investigative measures prior

to applying for the intercept orders for Target Telephones 2 and 4, which stands in stark contrast

to the efforts undertaken prior to wiretapping Target Telephone 1."   Soto-Peguero agrees the

Court should rule based on the information set forth in the affidavits. (Tr. 1 at 7-8).

As the record makes clear, SA Rideout explained the necessity in affidavits in support of

applications to intercept communications occurring over each of the Target Telephones.

The Affidavit for TT #1 was executed on **January 23, 2015**; for TT #2 on **February 24,**

**2015**; and for TT #4 on **April 13, and June 12, 2015** (Defendant's Exhibits H, I, J, and A). All

three Target Telephones were used by Taunton heroin trafficker Eddyberto Mejia-Ramos.   The

affidavit for TT #2 fully incorporated the affidavit for TT #1; and the affidavits for TT #4 fully

incorporated the affidavits for TT #1 and TT #2.   Interceptions over TT #1 began on **January**

**23 and continued until February 3**, when Mejia-Ramos stopped using TT #1 and began using

TT #2.   Defendant's Exhibit I.   Interceptions over TT #2 began on **February 24, and**

**continued until March 25, 2015**.   Interceptions over TT #4 began on **April 13, continued**

**until May 12, 2015,** and were renewed **from June 11 to July 11, 2015** (they were also renewed

after the defendant's July 6 arrest, from July 21 to July 28, 2015, when Mejia-Ramos and a

dozen others were arrested).

The **January 23 Affidavit** revealed that in late 2013 and early 2014, Taunton experienced a spike of heroin/opiate overdose deaths.   As a result, the Taunton Police Department reached out to the DEA in order to target major sources of supply for heroin being sold in Taunton.   The investigation focused on one of the supply organizations identified by the Taunton Police Department, the Jorge ARCE drug trafficking organization (DTO).   The proactive investigation began in late summer and continued through the fall of 2014, and included a series of controlled purchases of heroin by confidential informants (CI) from members of the DTO. (Ex. H at 10).   In interviews, the three CIs said Mejia-Ramos and Antwunn Jones distributed heroin and cocaine for Arce. (Ex. H at 14-17).   From September to December of 2014, the CIs made controlled purchases of heroin and cocaine from Mejia-Ramos, Jones, and Edwin Montalvo.   Mejia-Ramos used TT #1 to facilitate some of the sales. (Ex. H at 17-24).   SA Rideout also addressed in detail the objectives of the investigation and the need for the interception of communications over TT #1. (Ex. H at 29-41).   He summarized as follows:

> 47.   As set forth in this Affidavit, DEA, Taunton Police Department, Bridgewater Police Department and other law enforcement agencies have been investigating the drug trafficking activities of ARCE, MEJIA-RAMOS, MONTALVO, JONES and the other Target Subjects since September 2014.   Agents have (a) conducted physical surveillance; (b) conducted trash pulls; (c) installed and monitored a pole camera outside the residence of MEJIA-RAMOS; (d) obtained and analyzed extensive phone records and pen register data; (i) reviewed the arrest reports and evidence seized during the execution of 172 Oak Street, Taunton, the residence of Jorge ARCE, utilizing three independent CS's, made controlled purchases of heroin from MEJIA-RAMOS and Edwin MONTALVO and a controlled purchase of crack cocaine from Antwunn JONES. Despite this investigative activity, the investigation has been unable to uncover, among other things, 1) how much money MEJIA-RAMOS and his associates are making and how they are using their share of the proceeds; 2) the precise roles and extent of participation by people who appear to be significant participants in the operation, including Jorge ARCE, Edwin MONTALVO and Antwunn JONES; 3) how MEJIA-RAMOS and ARCE are communicating and who they are communication with their suppliers and the nature and extent of their criminal

relationships with MEJIA-RAMOS and his associates; 4) the identity and detailed roles of all the suppliers of heroin and cocaine.   Without uncovering these basic facts, the investigation will be largely unsuccessful, as the arrest and prosecution of ARCE and his receivers and main customers will leave the operation free to continue with other personnel and will not have held accountable many of the people most significantly involved in the offense.

48.     As set forth above, I believe that MEJIA-RAMOS now uses TT #1 to coordinate among receivers, customers, and key associates, to receive and distribute heroin. I believe that intercepting the wire and electronic communications over TT #1 will likely reveal how much money the DTO is making; what they are doing with that money; the roles and the extent of participation in the operation of ARCE, MONTALVO, JONES, and any other significant associate in addition to a more complete tally of the receivers and customers; and how the DTO communicates and relates to the suppliers, thereby identifying them and providing information on their roles in the supply operation.   As to the latter, until recently, we had not uncovered telephone toll records or pen register data directly linking the Target Telephones to any telephone number utilized by ARCE.   The toll activity reflected herein shows a significant connection between MEJIA- RAMOS, MONTALVO and JONES, but has yet to confirm the cellular telephone number or numbers used by ARCE. A review of toll records for TT#1 indicated the phone is in contact with several "pre-pay" cellular telephone with erroneous subscriber information.   I believe that interceptions over the Target Telephone, will likely include communications with ARCE or communications with trusted associates of how they are making such communications.

49.     I believe that the techniques we have used to date, and other traditional investigative techniques (which have been carefully considered but ultimately rejected as too risky or unlikely to succeed) are insufficient to attain the goals of the current investigation even when employed in concert with one another.   The basis for my conclusion is set out more fully in the following paragraphs.

50.     As the investigation has progressed, my fellow agents and I have used traditional investigative techniques but have been unable to make contact with ARCE and some of the other members of the organization, and only sporadic contact with members like MEJIA-RAMOS, MONTALVO, and JONES.   The continued use of controlled buys and surveillance is unlikely to be any more successful for two main reasons.   First, the nature of controlled buys by confidential informants is unpredictable and limited.   Like most confidential sources, the CSs utilized in this investigation are drug users whole lead unstable lives.   They are afraid of the targets and unwilling to be recorded, to testify, or to be identified.   Moreover, the CSs typically deal only with one or two people within the DTO and unable to buy from anyone else without raising suspicion and triggering security concerns.   Thus, they cannot advance the investigation beyond what has already been revealed.   The second main reason is that CS controlled buys and surveillance are insufficient proof of the scope of the activity involved.   Without recordings and a witness

willing to testify, the buys only establish probable cause, not evidence to convict beyond a reasonable doubt, of the distributions at issue.   More importantly, these particular distributions represent only an extraordinarily small slice of the criminal activity under investigation.   Even if the buys were used to obtain a search warrant, it would only reach MEJIA-RAMOS at this point, and at best only uncover a small fraction of the quantity of controlled substances I believe he distributes.   Surveillance has proved difficult and inconclusive.   In short, wire and electronic surveillance are the only reasonable means of penetrating this DTO.

(Ex. H at 29-32).

**The January 23 Affidavit** proceeded to review and analyze in detail the use or consideration of 11 investigative procedures (other wiretap evidence, use of cooperating sources, use of undercover agents, telephone records, grand jury, subject interviews, physical surveillance, search warrants, trash pulls and mail covers, subject arrests, and financial investigation) and explain why, either separately or in combination with the others, they either: had been tried and failed; they reasonably appeared to be unlikely to succeed if tried; or they were too dangerous.   (Ex. H at 32-41).

In the **February 24, 2015 Affidavit,** SA Rideout explained that the initial interceptions over TT #1 revealed communications among Mejia-Ramos and his various associates, suppliers, and customers of heroin, although there were no intercepted communications with Arce (who, it turned out, broke off his relationship with Mejia-Ramos some time earlier).   Mejia-Ramos then appeared to have two significant drug sources, including ALEX (Manuel Sanquintin, who was later arrested on March 16 with 500 grams of heroin).

SA Rideout explained the continued necessity of interceptions over Mejia-Ramos's replacement phone (TT #2):

35.   As set forth above, until on or about February 3, 2013, MEJIA-RAMOS used TT #1 to coordinate among receivers, customers, and key associates, to receive and distribute heroin and collect drug money. Intercepting the wire and electronic

communications over TT #1 began to reveal the roles and the extent of participation in the operation of MONTALVO and JONES, and revealed several other significant associates in addition to a more complete tally of suppliers and customers.   Continued interception, now of MEJIA-RAMOS's replacement phone – TT #2 – is necessary to reveal the connection to ARCE, the DTO's collection and use of money; and to better determine how the DTO communicates and relates to the suppliers, thereby identifying them and providing information on their roles in the supply operation.

36.     I believe that the techniques we have used to date, and other traditional investigative techniques (which have been carefully considered but ultimately rejected as too risky or unlikely to succeed) are insufficient to attain the goals of the current investigation even when employed in concert with one another.   The basis for my conclusion is set out more fully in the following paragraphs, which largely repeat my prior affidavit because they still apply and are modified only by the results of the interceptions of TT #1, which substantiate the value of the interceptions occurring over phones used by MEJIA-RAMOS.

**The April 13, 2015 Affidavit** revealed how interceptions over TT #2 led to Sanquintin's arrest on March 16, after he retrieved from Mejia-Ramos 500 grams of poor quality heroin. (Ex. J at 25-27).   Thereafter, two new suppliers, "El Duro" (later identified as Jorge Montalvo) and "Fino" (later identified as Saul Sanchez Rolon) reached out to supply heroin to Mejia-Ramos. (Ex. J at 27-33).   Mejia-Ramos stopped using TT #2 on or about March 26, 2015 (Ex. J at 39).   As a consequence, SA Rideout applied to intercept communications over TT #3, used by the supplier "El Duro," and TT #4, Mejia-Ramos's replacement phone. (Ex. J at 4).   SA Rideout explained that interceptions over the target telephones "remains the only available investigative technique which has a reasonable likelihood of revealing and securing admissible evidence needed to establish the full scope and nature of the offenses being investigated and the full scope and nature of the targeted drug distribution conspiracy." (Ex. J at 48).   He continued,

Based on the interceptions to date, it now appears that MEJIA-RAMOS has cut direct drug trafficking ties with ARCE.   The arrest of ALEX (Miguel SAN QUINTIN) accomplished one important objective of the investigation.   However, the quick resumption of the supply of heroin to MEJIA-RAMOS by runners for EL DURO suggests that the objectives of the

investigation will not be accomplished unless more is revealed about the full scope of the supply piece of the organization, including the identity of the runners, their source of supply, the location of stash houses, and the disposition of proceeds.   This kind of evidence can only be gleaned from wire and electronic interceptions occurring over TT #3. In addition, although interceptions over TT #1 and replacement phone TT #2 have been exceedingly productive, I and other investigators have yet to fully identify the range of MEJIA-RAMOS's customers, the location of the stash houses of him and his associates, and how they are laundering their drug proceeds.   Without interception over replacement phone TT #4, it will be difficult if not impossible to accomplish these goals.

52.   I believe that the techniques we have used to date, and other traditional investigative techniques (which have been carefully considered but ultimately rejected as too risky or unlikely to succeed) are insufficient to attain the goals of the current investigation even when employed in concert with one another.   The basis for my conclusion is set out more fully in the following paragraphs, which largely repeat my prior affidavits because they still apply and are modified only by the results of the interceptions of TT #1 and TT #2, which substantiate the value of the interceptions occurring over phones used by MEJIA-RAMOS, including TT #4, and demonstrate the need to expand interceptions to TT #3.

(Ex. J at 48-49).

**The April 13 Affidavit** then went on to describe and analyze the same investigative procedures and again showed why they had failed or were unlikely to succeed if tried.   (Ex. J at 49-61).   The discussion included re-assessments in light of new events. (Ex J at 51 - cooperating sources do not know ALEX or EL DURO); at 52 - ALEX and Shelbey Ceme did not cooperate; at 53 - analyzing new telephone records; at 55 - ALEX's interview was unhelpful; at 56 – difficulty and limitations of physical surveillance of EL DURO).

The **June 12, 2015 Affidavit** revealed that Soto-Peguero (then identified as Joshua Daniel De Jesus Pimentel, a/k/a UM 4083) "was MEJIA-RAMOS's most significant source of heroin supply for the period April 13 through May 13, 2015." (Ex. A at 19-24).   "MEJIA-RAMOS continued to communicate occasionally with Jorge MONTALVO, but did not rely on him as a significant source of supply.   FINO was in between, making some deliveries of heroin

to MEJIA-RAMOS, but not as much or as frequently as PIMENTEL.   As my fellow agents and

I home in on MEJIA-RAMOS's major customers and suppliers, renewed wire and electronic

surveillance of TT #4 will be critical to achieve the goals of this investigation." (Ex. A at 32-33).

> "I believe we have identified MEJIA-RAMOS's major customers, and that 172
> Oak Street is currently the most important location for receiving, storing, and preparing
> heroin.   **However, I know MEJIA-RAMOS is supplied by PIMENTEL and FINO,
> and we have yet to secure sufficient evidence to effectively prosecute them.
> Although, as set forth above, we have identified locations in Boston and Providence
> associated with PIMENTEL and FINO, respectively, we do not yet know the details
> of how they use those locations, or whether other locations are also important.**
> Finally, we continue to conduct additional investigation to learn the stash houses for
> MEJIA-RAMOS's major customers so that they can be effectively prosecuted.   Without
> renewed interception over TT #4, it will be difficult if not impossible to accomplish these
> goals."

> 50.    In the absence of renewed wire and electronic interceptions, I believe that
> the techniques we have used to date, and other traditional investigative techniques (which
> have been carefully considered but ultimately rejected as too risky or unlikely to succeed)
> are insufficient to attain the goals of the current investigation even when employed in
> concert with one another.   The basis for my conclusion is set out more fully in the
> following paragraphs, which largely repeat my prior affidavits because they still apply
> and are modified only by the results of the interceptions of TT #3 and TT #4, which
> substantiate the value of the interceptions occurring over phones used by MEJIA-
> RAMOS.

(Ex. A at 47-48) (emphasis added).

**The June 12 Affidavit** then went on to describe and analyze the same investigative

procedures and again showed why they had failed or were unlikely to succeed if tried. (Ex. A at

48-60).   The discussion again included re-assessments, where relevant, in light of new events.

(Ex A at 52 – telephone records; at 55 – surveillance; at 57 – search warrants).

## II.    THE CAR STOP WAS SUPPORTED BY PROBABLE CAUSE

**Summary.**   The investigation revealed that Mejia-Ramos was a regional heroin

distributor and that after March 16, Soto-Peguero emerged as his primary source of supply.

10

During the third and fourth interception periods (April 13 to May 12 and June 11 to July 11), Soto-Peguero made numerous heroin deliveries to Mejia-Ramos, and often sent his "woman" Mercedes Cabral to make the deliveries.   On the evening of July 6, Soto-Peguero sent Cabral to make another heroin delivery to Mejia-Ramos, but she was stopped by investigators before she arrived.

**Wiretap Reveals SOTO-PEGUERO Supplied Heroin to MEJIA-RAMOS**.   In particular, DEA intercepted Mejia-Ramos's cellular telephones from January 23 to February 4, from February 24 to March 25, from April 13 to May 12, from June 11 to July 11, and from July 21 to July 28.   (Government Exhibit (G. Ex.) 1.   On March 16, investigators conducted a walled off stop of Manuel Sanquintin, one of Mejia-Ramos's suppliers.   During a search, investigators discovered and seized a half a kilogram of heroin and arrested Sanquintin. (Tr. 1 at 13-14).

DEA began to intercept communications involving Soto-Peguero in March of 2015. (Defendant's Motion Exhibit J, Doc 119-12 at 24; Defendant's Motion Exhibit A, Doc 119-1 at 20).   Soto-Peguero was also known as "UM 4083," and "Gambao," and was identified during a car stop on May 12, 2015 as Daniel De Jesus Pimentel, which agents later learned that was a false identification. (Defendant's Motion Exhibit A, Doc 119-1 at 20; G. Ex. 6; Tr. 1 at 16-17). Also on May 12, investigators identified Soto-Peguero's female courier as Mercedes Cabral. (G. Ex. 6).

The interceptions and surveillance of Soto-Peguero and Cabral included:

**On March 20,** Soto-Peguero told Mejia-Ramos, "When I bring you stuff, you will be able to see in advance.   Because when I get stuff, I get it with time.   I can come by tonight, to bring you the samples so you can give it to your people during the day.   I will send it tonight if I

can. (Defendant's Motion Ex. J, Doc 119-12 at 24).

**From April 13 to May 12**, Soto-Peguero was Mejia-Ramos's "most significant heroin source of supply." (Defendant's Exhibit A, Doc 199-1 at 21).   For example, on **April 13**, Soto-Peguero told Mejia-Ramos he brought him "230 this round" and overall it was "690." Soto-Peguero agreed to deliver more that night. (Id. at 22).   On **April 15**, Mejia-Ramos told Soto-Peguero that people don't like it, and asked if he changed "the work" or "the cut."   (Id. at 23).   Soto-Peguero agreed to take it back and sent "her" to 172 Oak Street in Taunton. (Id. at 24).

**On April 20, at 9:43 pm**, Mejia Ramos told Soto-Peguero "they don't like the work." **At 10:07 pm,** Soto-Peguero told Mejia-Ramos, "My woman is on her way to the same place." **At 10:45 pm**, Special Agent Rideout observed Cabral (whose identity was then unknown) drive a Nissan Murano to 172 Oak Street and leave five minutes later.   Rideout followed the Murano as it traveled to Boston.   The Murano was registered to "Jhonathan Pimentel." (G. Ex. 4).

**On April 22**, Mejia-Ramos told Soto-Peguero "that is not good. The stuff through the nose burns and the stuff through the veins gives you a rash, so it could be the cut."   Soto-Peguero said he would send someone to grab it now and asked if Mejia-Ramos still had the "whole thing."   Mejia-Ramos said he had the whole thing except for one that was opened. (Defendant's Exhibit A, Doc 199-1 at 24).

**On April 28,** Soto-Peguero said he would bring Mejia-Ramos "200 more."   At 5:08 pm, Soto-Peguero told Mejia-Ramos, "my woman is gonna be there in around 15 or 20 minutes."   At 5:55 pm, investigators observed Cabral (still not identified) arrive at Mejia-Ramos's 187 Winthrop Street residence and enter.   She exited three minutes later and drove back to Boston. (G.Ex. 5).

**On June 9**, investigators, who had installed a court-authorized GPS device on May 1, tracked the Murano from the Norwest Woods Apartment complex to New York City.   In particular, the Murano left Norwood at 4:30 am and arrived in the Bronx at 9:40 am.   It remained in the Bronx for three and a half hours, then departed and drove to Providence, before arriving back in Norwood at 6:00 pm.   Investigators observed Soto-Peguero driving in Norwood.   Cabral exited the vehicle and walked toward Apartment 632, Norwest. (G. Ex. 3; Tr. 1 at 16).

**On June 19, at 11:57 am,** Mejia-Ramos asked Soto-Peguero to "bring me something for today and Soto-Peguero replied, "I already have everything ready there.   I have 309 for you, with the usual minus/less."   **At 4:30 pm,** Mejia-Ramos told Soto-Peguero to come, and Soto-Pegeuro said he would be there in an hour.   Cabral then traveled in the Murano directly from 632 Norwest to Mejia-Ramos's residence at 187 Winthrop Street in Taunton.   **At 6:19 pm,** Cabral called Mejia-Ramos and asked where to go and Mejia-Ramos directed her to his residence.   **At 7:02 pm,** investigators observed Cabral arrive.   **At 7:08 pm,** Cabral called Mejia-Ramos and said she would knock on the door and Mejia-Ramos said he would answer. Investigators then observed Cabral exit the Murano carrying a purse, enter 187 Winthrop Street, and depart a short time later.   **At 8:51 pm,** Soto-Peguero told Mejia-Ramos that "I sent you 280." (G. Ex. 3 at 5-6; G. Ex. 8).

**On June 30,** after Mejia-Ramos returned from a week's vacation, and asked Soto-Peguero to bring him "something heavy duty because the guys are dry." **At 10:57 pm,** Mejia-Ramos said he would be there in 30 seconds and Soto-Peguero said he would be there in two minutes.   At the same time, investigators observed Mejia-Ramos arrive back at 187 Winthrop

13

Street, quickly followed a white Hyundai Enterprise rental car (the same car in which Cabral was stopped on July 6). Investigators observed Soto-Peguero and another male exit the Hyundai and enter the residence. (G. Ex. 3 at 7-8).

On July 1, Soto-Peguero asked, "and this food, is it neat?   What do they tell you?" Mejia-Ramos replied, "they have not said anything." (G. Ex. 3 at 8).

On July 2, Soto-Peguero said he had some "shit" left and asked if Mejia-Ramos had any money. Mejia-Ramos said he had "everything out there," but could give Soto-Peguero something tomorrow.

**Wiretap on July 6, 2015 Revealed SOTO-PEGUERO Agreed to Send MEJIA-RAMOS a Kilogram of Heroin.**   In particular, at **1:43 pm**, Soto-Peguero called Mejia-Ramos and asked what was up.   Mejia-Ramos said, "when I get down there I'm gonna give you a call so you can bring that up, because most likely I'll be ready for today."   Soto-Peguero said, "I have a lot of 'food,' try to resolve that, that I have a lot of food around there, I got ready for you."   **At 8:57 pm**, Mejia-Ramos said he was waiting for a friend who should be there in 30-45 minutes.   Soto-Peguero asked, "So about 10:30 - 11:00?"   Mejia-Ramos said to come by at 10 and "bring something heavy."   Soto-Peguero said, "I'm going to send the woman/wife."   Mejia-Ramos said, "Okay, send me something heavy, heavy duty, big boy."   Soto-Peguero asked if Mejia-Ramos was going to clean the bill, which was at 19,750.   Mejia-Ramos said, "Let me do the math real quick. Not the math of that, but the math of what the black guy is going to bring me and what I have real quick."   (G. Ex. 2).

At 9:38 pm, Soto-Peguero called Mejia-Ramos and said, "The woman is on her way. She should be there in 20 minutes, half an hour."   Mejia-Ramos said alright.

By this time, SA Rideout concluded Soto-Peguero was sending Cabral to deliver heroin to Mejia-Ramos and pick up drug proceeds.   SA Rideout decided to attempt to seize the heroin by conducting a walled off car stop. (Tr. 1 at 19-20).   A stop is "walled off" to protect the integrity of the on-going investigation by not revealing to the person stopped the existence of the wiretap investigation. (Tr. 1 at 48-49).   **At 9:34 pm**, investigators followed Cabral as she drove the Hyundai Sonata from 632 Norwest Lane to Route 24 South, and exited onto Route 44 West toward Taunton.

Task Force Officer Christian Theodore contacted Massachusetts State Police Troopers Ryan Walczak and K-9 Trooper Jason Vital who, at Theodore's request, conducted a traffic stop. (Tr. 1 at 53; Defendant's Motion Ex. C).   Cabral was operating on a suspended license (Tr. 1 at 23), and was not on the rental agreement for the Sonata (which was rented to Jonathan Pimental). (Defendant's Motion Ex. C and D).   Trooper Vital had Cabral exit the vehicle, and she was placed under arrested.   Cabral tried to take a purse and cell phone from the car, but troopers asked her to leave the items in the car and she handed the purse to one of the troopers. (Defendant's Motion Ex. D).   TFO Theodore observed the open purse and saw green cellophane wrapping typically used by traffickers to package their product. (Tr. 1 at 56-57).   The troopers then searched the contents of the purse and discovered and seized the green wrapped heroin and $501.   (Subsequent analysis confirmed the packages contained 918.3 grams of heroin.).

### III.    EXIGENT CIRCUMSTANCES

632 Norwest Drive was a two story attached apartment unit within a larger complex.   It had an entrance in front and back. (Tr. 1 at 21).   The back entrance was not feasible for investigators to observe with potentially being compromised. (Tr. 2 at 21).

15

After confirming that heroin was seized from Cabral, SA Rideout instructed SA Meletis to "secure" or "freeze" 632 Norwest Drive so he could then apply for a search warrant. (Tr. 1 at 25, 40).   He had not sought a warrant earlier because investigators wanted to make sure they had a seizure of drugs before applying for the warrant and potentially compromising the investigation. He was also aware that drug dealers frequently talk about deals that do not materialize. (Tr. 1 at 48; see also Tr. 2 at 37 – SA Meletis testified, "everything was speculation because we didn't know how it was going to turn out . . . half the time, things really don't develop.").   He was concerned that Soto-Peguero would become suspicious and attempt to destroy evidence by flushing it down the toilet or move it out of the apartment.   (Tr. 2 at 48-49).

At approximately **10:13 pm**, shortly after the seizure, nine officers approached the front and back of 632 Norwest Lane, which was a small two bed room, two story, attached condominium within a larger development.   The officers included SA Angelo Meletis and members of a local Task Force: Lt. Peter Kelly (Norwood), Lt. Wayne Cunningham (Wellesley), Lt. Michael Benedetti (Norwood), Anthony Lopes (Norwood), David Eysie (Norwood), Kevin Mahoney (Dedham), Mike Buckley (Norwood), Officer Wannersterand, Peter Curran (Norwood) and Lt. Chris Flanagan.   Meletis and the first six officers went in front and the last four went in back.   The lights and television were on downstairs, and officers in the rear could hear people talking.   (Defendant's Motion Ex G at 10-11) (Government's Motion Exhibit 1 – Grand Jury Testimony of Kevin Mahoney; Motion Exhibit 2 – Grand Jury Testimony of Angelo Meletis; Motion Exhibit 3 – DEA 6 Report of Angelo Meletis).

Officer Eysie knocked on the door "loudly" with his hand in two cycles with four to seven knocks, while "yelling the word 'police' out."   (Tr. 1 at 67-68).   He knocked and yelled

"Police, open the door" very loud, where someone in the house should have heard it. (Tr. 2 at 24).   No one answered.   After two minutes, Detective Sgt. Mahoney began to ram the door in an attempt to gain entry to secure the premises.   (Tr. 1 at 70).   After hitting the door four or five times, officers heard a gunshot. (Tr. 1 at 71; Tr. 2 at 25).

Other officers perceived a bullet pass by them and they took cover.   Officers Curran and Flanagan, standing directly to the side of the rear sliding glass door, observed two males approach, part the blinds, make eye contact with the officers, and quickly retreat back into the apartment.   (Defendant's Motion Ex G at 10-11) (Government's Motion Exhibit 1 – Grand Jury Testimony of Kevin Mahoney; Motion Exhibit 2 – Grand Jury Testimony of Angelo Meletis; Motion Exhibit 3 – DEA 6 Report of Angelo Meletis).

Detective Sgt. Mahoney observed two men look out the window in the upstairs front bedroom.   (Tr. 1 at 72).   Officers in the rear made a forced entry, secured the stairs, and let the other officers in.   They shouted for the two men to come down on their stomachs, feet first and both the larger man (Soto-Peguero) and the smaller man (Guzman-Ortiz) complied and were arrested.   As Soto-Peguero came down, bags of heroin dropped from his pants. (Tr. 2 at 28). Officers arrested Soto-Peguero and Guzman-Ortiz. (see also Defendant's Motion Ex G at 10-11) (Government's Motion Exhibit 1 – Grand Jury Testimony of Kevin Mahoney; Motion Exhibit 2 – Grand Jury Testimony of Angelo Meletis; Motion Exhibit 3 – DEA 6 Report of Angelo Meletis).

Detective Sgt. Mahoney and SA Meletis then went upstairs to make sure there were no other people or weapons.   (Tr. 1 at 72).   Meletis, who was in charge at the scene, believed there could have been other people present inside the apartment. (Tr. 2 at 29).   Mahoney and Meletis

went to the front bedroom and observed a sparsely furnished room with an inflatable air mattress. (Tr. 1 at 73; Tr. 2 at 30)).   They confirmed no one was in the room.   Mahoney observed "a block of an unknown object that I believe was wrapped like I have seen kilo packages before, half kilo packages, sticking out of the floor vents below the window where I saw the two men in the apartment."   (Tr. 1 at 74).   It was sticking out of the vent.   (Id.).   Meletis also observed a rectangular package "protruding out of the air vent." (Tr. 2 at 30).   Mahoney pulled it out and saw a firearm underneath.   He secured both and went outside to guard the apartment.   (Tr. 1 at 75; G. Ex. 9).   Meletis went to the other bedroom and confirmed there were no other persons present.   As he looked around the bed, he saw a black bag and looked inside.   It contained a package of narcotics, a tan powder wrapped in clear electrical tape. (Tr. 32).   Meletis returned to the front bedroom and observed the firearm, then left. (Tr. 2 at 33).

**Soto-Peguero testified** that he was at 632 Norwest Drive talking with Mr. Guzman at the table.   He had a loaded firearm on the table, and a kilogram of heroin. (Tr. 2 at 76-80).   He heard someone banging on the door like they were trying to break it.   He did not hear anyone shout, "police."   He thought he was going to get robbed.   He panicked.   He grabbed the gun, got up, and looked toward the kitchen.   He continued to hear the banging.   He fired a shot through the door.   Then he tried to run out the back, but then he saw people in back and heard them announce it was police.   He grabbed the heroin and he and Guzman ran upstairs to the front, guest bedroom.   He opened the vent and placed a shirt, a kilogram of heroin, and the firearm down and closed the vent to try and hide them.    Soto-Peguero testified that the back bedroom was the bedroom he and Ms. Cabral used and that on the night in question, the bag containing the other kilogram of heroin was not on the floor, but in his bedside drawer.   Soto-

Peguero also testified that after he and Guzman were arrested, officers went upstairs and he heard, "I think they was breaking stuff."  (Tr. 2 at 58-71).   On cross-examination, Soto-Peguero acknowledged that he was aware of drug dealers getting robbed, sometimes by people pretending to be police. (Tr. 2 at 74-75).

**Officers Obtained and Executed Search Warrant.**   The apartment was then secured and, on July 7, 2015, SA Rideout obtained a federal warrant to search the apartment for evidence of heroin trafficking.   The search warrant was signed at 11:40 am and executed that same day. (Id.)

**The Affidavit in Support of the Warrant Set Forth Additional Facts.**   The Rideout Affidavit set forth the July 6 intercepted calls, the stop and seizure of 1 kilogram of heroin from Cabral, and the events at the Norwood apartment that evening.   In addition, the Rideout Affidavit incorporated two additional affidavits submitted on June 12 and April 13, 2015 in support of the earlier wiretap orders. (Defendant's Motion Exhibit F at p. 3; Exhibit A (June 12); Exhibit J (April 13).   Taken together, the affidavits revealed that Soto-Peguero had been supplying heroin to Mejia-Ramos since March of 2015, when agents seized 500 grams of heroin from Mejia-Ramos's previous heroin supplier. (Ex. F at 3).   Agents knew Cabral and Soto-Peguero lived at the Norwood Apartment, although it was leased to a relative.   The affidavits also recounted several intercepted communications between Soto-Peguero and Mejia-Ramos from June 15 to July 5 that tended to show that Soto-Peguero regularly supplied heroin to Mejia-Ramos, and used the Norwood apartment to store it.   For example, the affidavit recounted the June 19 activity, when Mejia-Ramos called and wanted Soto-Peguero to "bring something for today."   Soto-Peguero said, "I already have everything ready there.   I have 309 for you."   Later

19

that afternoon, Mejia-Ramos told Soto-Peguero to come, and Soto-Peguero said he would be

there in an hour.   A tracking device showed the Murano used by Soto-Peguero and Cabral

traveled directly from the area of the Norwood apartment to Mejia-Ramos's residence in

Taunton. (Ex. F at 5).   During the same time, Cabral called Mejia-Ramos, said she was on her

way, and asked whether she should go to his mom's house or his cousin's.   Mejia-Ramos told

her to go to his mom's residence.   Investigators observed Cabral arrive in the Murano alone,

enter Mejia-Ramos's residence, and then depart.   That night, Mejia-Ramos called Soto-Peguero

and said he was expecting "three." Soto-Peguero replied he only sent 280 because "I took some

work for other people." (Defendant's Motion Ex. G).

## DISCUSSION

### Necessity

The defendant moves to suppress the wiretap evidence on the ground that agents failed to

exhaust investigative alternatives before seeking authority to intercept communications occurring

over Mejia-Ramos's replacement phones. The claim is without merit.

Title III requires that a wiretap application include "a full and complete statement as to

whether or not other investigative procedures have been tried and failed or why they reasonably

appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).   Upon

such application, the judge may enter an order approving the requested interception if the judge

determines, among other things, that "normal investigative procedures have been tried and have

failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §

2518(3)(c); *see also United States v. Kahn*, 415 U.S. 143, 153 n. 12 (1974) (noting that the so-

called "necessity requirement" was "designed to assure that wiretapping is not resorted to in

situations where traditional investigative techniques would suffice to expose the crime").

In order to satisfy the necessity requirement, the government must demonstrate that it has made "a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls." *United States v. Lopez*, 300 F.3d 46, 53 (1st Cir. 2002).   However, the necessity requirement is not tantamount to an exhaustion requirement. *Id.; United States v. Edwards*, 69 F.3d 419, 429 (10th Cir.1995) (law enforcement officials are not required "to exhaust all other conceivable investigative procedures before resorting to wiretapping."); *United States v. David*, 940 F.2d 722, 728–29 (1st Cir. 1991) (necessity shown even though government had not attempted to use search warrants, pen registers, or undercover agents). Consequently, Title III does not "force the government to run outlandish risks ... before seeking a wiretap." *Lopez*, 300 F.3d at 53; *United States v. Cartagena*, 593 F.3d 104, 110 (1st Cir. 2010) (application upheld where affidavit listed specific reasons why traditional investigative methods used up to that point had not yielded sufficient information and provided thorough explanations as to why other traditional investigative techniques were unlikely to be fruitful.).

Generalities or statements in the conclusory language of the statute are insufficient to support a wiretap application. The statements must be factual in nature and they must specifically relate to the individuals targeted by the wiretap. *United States v. Castillo-Garcia*, 117 F.3d 1179, 1188 (10th Cir. 1997), *overruled on other grounds, United States v. Ramirez-Encarnacion*, 291 F.3d 1219 (10th Cir. 2002).

The DEA's inability to identify key conspiracy members and the conspiracy's awareness of law enforcement activity militate in favor of using Title III interceptions. *Lopez*, 300 F.3d at

54.   Gaps in an investigation, and a need to corroborate confidential source information, are also appropriate factors to consider in determining necessity. *United States v. Guerra–Marez*, 928 F.2d 665, 671 (5th Cir. 1991).   Where an affiant provides "detailed and plausible descriptions of the limitations" of traditional methods in achieving "the overall goal of dismantling the entire drug-trafficking network," the necessity requirement is generally satisfied. *United States v. Szpyt*, 2008 WL 4840896, at *16 (D. Me. Nov. 9, 2008).

In reviewing the sufficiency of the government's showing of necessity, the Court's role is not to make a *de novo* determination of sufficiency as if it were the issuing judge, but to decide if the facts set forth in the application were "minimally adequate" to support the determination that was made. *United States v. Ashley*, 876 F.2d 1069, 1074 (1st Cir. 1989) (*quoting United States v. Scibelli*, 549 F.2d 222, 226 (1st Cir. 1977)). That is, the sufficiency of the affidavit should be upheld where the reviewing court determines that the issuing court could have "reasonably concluded" that normal investigatory procedures reasonably appeared to be unlikely to succeed. *Id.*   This inquiry is "not rigid or rule-oriented; to the precise contrary, Title III demands a practical, commonsense approach to exploration of investigatory avenues and relative intrusiveness." *David*, 940 F.2d at 728.   A wiretap authorization order is presumed proper, and the defendants carry the burden of overcoming this presumption." *United States v. Mondragon, 52 F.3d 291, 292 (10th Cir.1995).*

The defendant concedes that the initial showing of necessity for TT #1 was established. That concession is understandable, as **the January 23 Affidavit** carefully set forth the progress of the investigation, the objectives remaining, how eleven traditional investigative procedures had either been tried and failed or were wholly unlikely to succeed. (Ex. H).

Instead, he argues that the subsequent showing for TT #2 and TT #4 was inadequate because it largely repeated the showing for TT #1.   To the contrary, as demonstrated above, the affidavits carefully recounted the progress of the investigation, showed how critical objectives had not been achieved, and explained why additional interception was the only investigative option reasonably likely to succeed.   For example, in **the April 13 Affidavit** recounted the arrest of one supplier, but showed how new suppliers appeared, and how continued interception was necessary to identify them and reveal their operations. (Ex. J at 48).   Likewise, **the June 13 Affidavit** indicated that agents had identified Mejia-Ramos's major customers, but had yet to obtain sufficient evidence to prosecute Soto-Peguero and Fino, the other significant heroin source, nor identify critical locations. (Ex. A at 47).

The defendant particularly argues that the government made no effort to recruit new cooperating sources or foster their current sources. Memorandum at 7. However, **the April 13 Affidavit** made clear that the same analysis as contained in the earlier affidavits, modified by the results of the interceptions, still applied. (Ex J at 49).   It specifically stated that the use of controlled buys and surveillance were unlikely to be any more successful because the sources were drugs users, unstable, and unable to buy from more than one person in the organization without raising suspicion and creating unacceptable dangers, and controlled buys would not reveal the scope of the activity under investigation. (Id.)   Of the sources used in the past, one had been deactivated and was no longer willing to participate, another knew only Jones and was not in a position to make purchases from anyone else, and the third dealt only with Mejia-Ramos and Edwin Montalvo, and had no ability to deal with anyone else. (Ex J at 51).   Nor did the prospect of trying to flip an arrestee hold promise, as the experience on March 16 with Manuel

Sanquintin demonstrated.    Thus, the defendant's claim is demonstrably untrue.

Contrary to the defendant's implicit contention, the government is not under an obligation to repeat forms of investigation between each wiretap. "Rather, under Title III, it must pause to consider whether normal investigative procedures could be used effectively, particularly in light of any evidence obtained as a result of each succeeding wiretap." *United States v. Garcia*, 232 F.3d 1309, 1315 (10th Cir. 2000).   Agent Rideout's affidavits did just that. (see i.e. Ex. A at 47) ("In the absence of renewed wire and electronic interceptions, I believe that the techniques we have used to date, and other traditional investigative techniques (which have been carefully considered but ultimately rejected as too risky or unlikely to succeed) are insufficient to attain the goals of the current investigation even when employed in concert with one another. The basis for my conclusion is set out more fully in the following paragraphs, which largely repeat my prior affidavits because they still apply and are modified only by the results of the interceptions of TT #3 and TT #4, which substantiate the value of the interceptions occurring over phones used by MEJIA-RAMOS.").

The defendant cites *United States v. Gonzalez, Inc.* 412 F.3d 1102, 1115 (9th Cir. 2005), *amended on denial of reh'g*, 437 F.3d 854 (9th Cir. 2006) in support of his contention that the government failed to make an effort to recruit new sources or foster old ones and repeated portions of the necessity section.   That case is easily distinguishable.   *In Gonzalez,* a case involving an alleged conspiracy to smuggle aliens into the United States using a public bus company, the court found that before the interception order was sought, "no independent verification of any significance was really done to indicate why the wiretaps at the Blake Office were necessary." The affidavit submitted in support of the Blake Avenue wiretap contended that

only the following investigative methods targeted at the Blake Avenue office were tried before a

wiretap was sought: (1) five-days-worth of pen register analysis; (2) an equally short use of trap-

and-trace analysis; and (3) limited physical surveillance of the Blake Avenue office. The court

found that, "this limited use of traditional methods does not establish that normal tools were

sufficiently exhausted before the government requested a wiretap."   Moreover, the affiant failed

to make plain that cooperating sources had successfully infiltrated the Blake Avenue office, nor

explain why that would not serve the purposes of the investigation as well as the proposed

interception.   The court concluded that based on the facts in the affidavit, the government "side-

stepped its responsibility to use promising traditional techniques when it began to investigate the

Blake Avenue office, and instead conducted only the most cursory investigation before seeking a

wiretap."   In this case, by contrast, SA Rideout provided detailed context and case-specific

reasons showing why eleven different investigative procedures conducted over more than six

months had either failed to accomplish the objectives, or were reasonably unlikely to succeed if

tried.   Judge Saris's finding that these efforts sufficiently established the requisite necessity is

far more than minimally supported by the record.

Accordingly, this claim is without merit and should be denied without a hearing.

## Car Stop

The defendant seeks to suppress the heroin and other evidence recovered from the Sonata

on the additional ground that the car stop was not justified by the marked lane violation noted in

the MSP report, and that the inventory search was a pretext for an investigative search that

required a warrant.   To the contrary, the car stop and search were justified by probable cause.

The Fourth Amendment bans only unreasonable searches and seizures, *Terry v. Ohio*,

392 U.S. 1, 9 (1968), and a search done without a warrant supported by probable cause is presumptively unreasonable, unless an exception to the warrant requirement applies. *United States v. Lopez*, 989 F.2d 24, 26 (1st Cir. 1993).   An officer can stop a car if he sees a driver commit a traffic offense, even if the stop is just an excuse to investigate something else. See, *Whren v. United States*, 517 U.S. 806, 810, 813 (1996) (subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis).   An officer can then order the occupant out of the auto. *Maryland v. Wilson*, 519 U.S. 408, 410, 414–15 (1997).

Officers may search the passenger compartment of an automobile incident to arrest. *New York v. Belton*, 453 U.S. 454, 460 n. 4 (1981).   Probable cause justifies the search of a lawfully stopped vehicle - every part of the vehicle and its contents that may conceal the object of the search. *United States v. Ross*, 456 U.S. 798, 825 (1982). Probable cause means "reasonable cause," something significantly less exacting than "more likely than not" or "by a preponderance of the evidence." *United States v. Melvin*, 596 F.2d 492, 495 (1st Cir.1979).   Probable cause "merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983).   "The standard of probable cause is the probability, not a prima facie showing, of criminal activity." *United States v. Ciampa*, 793 F.2d 19, 22 (1st Cir. 1986).   In assessing probable cause, courts are guided by the collective knowledge or "fellow-officer" rule, that is, where police are engaged in a collaborative effort, the knowledge of each officer may be pooled in establishing probable cause. *United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002); *United States v. Fiasconaro*, 315 F.3d 28, 36 (1st Cir. 2002) (the

focus is on the aggregate knowledge possessed by all of the officers involved in the investigation).

The undisputed facts clearly show probable cause to believe that Cabral possessed heroin in the Sonata.   The agents, troopers, and officers knew that Mejia-Ramos was a heroin dealer, that Soto-Peguero was his source, and that Cabral made heroin deliveries on Soto-Peguero's behalf to Mejia-Ramos.   On the evening of July 6, 2015, Soto-Peguero sent Cabral to deliver more heroin to Mejia-Ramos.   At 9:38 pm, Soto-Peguero told Mejia-Ramos, "The woman is on her way."   At 9:34 pm, agents followed Cabral as she drove the Hyundai Sonata alone from Norwest Street towards Taunton, where Mejia-Ramos lived. The conjunction of events clearly gave rise to probable cause to believe that Cabral possessed heroin in the Sonata.   The defendant makes no effort to dispute this showing.

Instead, he claims the stop for a lane change was unjustified.   He stated State Troopers "executed a planned "traffic stop" of the Hyundai Sonata, ostensibly because Ms. Cabral committed a marked land violation.   The Troopers, however, did not have reasonable suspicion to stop the vehicle on that basis."   But a stop based on probable cause is justified, whether or not a traffic violation occurs. *United States v. Pugh*, 223 F. Supp. 2d 325, 329 (D. Me. 2002) ("When officers have probable cause to stop a car and arrest one or more of its occupants, as was the case here, they may also search and seize the arrested person and the contents of the passenger compartment of the car,"); *United States v. Flynn*, 309 F.3d 736, 739 (10th Cir. 2002) (The police may stop a car when they have developed a reasonable individualized suspicion of wrongdoing).   Even if the car was impounded and might have been searched at leisure, a warrantless contemporaneous search of the entire vehicle based on probable cause to search the

27

car is permissible and does not violate the Constitution. *United States v. Maguire*, 918 F.2d 254, 261 (1st Cir. 1990).   Thus, whether or not Ms. Cabral actually committed a traffic violation is immaterial to the legality of the stop based on probable cause.

The defendant claims the Troopers justified their search of Cabral's vehicle as an inventory search even though it was a pretext for an investigative search.   This construction of the issue ignores the facts.   The Troopers, based on their interaction with the DEA, were justified in stopping and search the car based on probable cause.   Moreover, upon stopping the car and identifying Ms. Cabral, the Troopers arrested her for driving with a suspended license. They were therefore entitled incident to that arrest to search the passenger compartment of the car. *New York v. Belton*, 453 U.S. 454, 460 n. 4 (1981).

The defendant cites *Commonwealth v. Ortiz*, 88 Mass. App. Ct. 573, 576 (2015), in support of his contention that it is improper to use an inventory search as a pretext for an investigative search.   This state case has no application here because the stop involved in *Ortiz* was not based on, nor justified by, probable cause.

The defendant argues that the collective knowledge rule is inapplicable because the evidence in the record does not establish that the DEA or knowledgeable officers "specifically instructed the Troopers to stop Ms. Cabral, which the cases suggest is a prerequisite for invoking the collective knowledge doctrine under these circumstances."

The argument fails legally and factually.   As the evidence shows, DEA agents and task force officers contacted the Troopers and requested that Cabral be stopped.   (Tr. 1 at 53-55). Legally, the case law cited by the defendant does not establish that "specifically instructing" officers to make the stop is a prerequisite to the rule.   To the contrary, the cases make clear that

the collective knowledge rule will apply where officers are working in a coordinated fashion.

Accordingly, the stop and search of Cabral's car was justified by probable cause and did not require a warrant.

**Exigent Circumstances.**

The defendants seek to suppress the fruits of the searches of the 632 Norwest apartment on the ground that the first search was not justified by exigent circumstances and went beyond the bounds of a protective sweep, and that the second was tainted by the first.

As a general proposition, the securing of a dwelling on the basis of probable cause to prevent the destruction or removal of evidence while a warrant is being sought is not an unreasonable seizure of either the dwelling or its contents. See *Illinois v. McArthur*, 531 U.S. 326, 334 (2001) ("We have found no case in which this Court has held unlawful a temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time.").

A "protective sweep" is "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327 (1990).   The Fourth Amendment permits a protective sweep if the searching officer possessed "a reasonable belief," based on specific and articulable facts which reasonably warranted the officer in believing, that the area swept harbored an individual posing a danger to the officer or others. "Warrantless searches of a dwelling-place are presumptively unreasonable unless the police can prove consent or the existence of exigent circumstances."   *United States v. Curzi*, 867 F.2d 36, 41 (1st Cir. 1989).

Sweeps are constitutionally impermissible unless (1) supported by probable cause, and (2) justified by consent, **exigency**, or some other acceptable reason for bypassing the usual constraints of the fourth amendment. *United States v. Veillette*, 778 F.2d 899, 902–03 (1st Cir. 1985).   To determine validity, the court must ascertain "whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." *United States v. Adams*, 621 F.2d 41, 44 (1st Cir. 1980).   Courts consider factors such as: the gravity of the underlying offense; whether delay poses a **threat** to police or the public safety; and whether there is a **great likelihood that evidence will be destroyed** if there is a delay until a warrant can be obtained." *United States v. Veillette*, 778 F.2d at 902; *Kentucky v. King*, 131 S. Ct. 1849, 1857 (2011) ("Destruction of evidence issues probably occur most frequently in drug cases because drugs may be easily destroyed by flushing them down a toilet or rinsing them down a drain.").

The so-called "police-created exigency" doctrine—the notion that exigent circumstances can justify a warrantless search only where the police do not themselves create the exigency by, for example, announcing their presence to occupants of a dwelling - was carefully considered and squarely rejected by the Supreme Court in *Kentucky v. King*, 131 S. Ct. 1849 (2011).   *King* makes clear that as long as officers neither violate nor threaten to violate an individual's Fourth Amendment rights before entering a dwelling, the officers cannot be said to have impermissibly created exigent circumstances. *King*, 131 S.Ct. at 1858.   This is true regardless of whether the officers had probable cause and sufficient time to obtain a warrant and elected not to do so; whether it was reasonably foreseeable to the officers that their tactics would result in an exigency; or whether the police created the exigency by acting in bad faith. *Id*.   In short, the police had the right to knock on the door of 632 Norwest Lane to determine whether anyone was

inside and if so, to attempt to speak to them. *Id.*, at 1854, 1858, and those actions did not

impermissibly create an exigency. *United States v. Almonte-Baez,* Criminal No. 14-10089-RWZ,

Docket Entry 58 (December 1, 2014).

In *United States v. Edwards*, 602 F.2d 458 (1st Cir.1979), the First Circuit found exigent

circumstances justified warrantless entry where government agents could not have obtained a

search warrant for defendants' home earlier and legitimately feared that defendants had

discovered their surveillance and would destroy the evidence before a search warrant could be

obtained.   The *Edwards* court cited with approval *United States v. Flickinger*, 573 F.2d 1349,

1356 (9th Cir. 1978), where government agents had arrested defendant's confederates about

three hours before they entered his home without a warrant. The Court held that:

> it would not be unreasonable for the DEA officers to fear that a warning telephone call
> would come to the defendant's home from defendant's confederates or from someone
> they would contact. In addition, the agents could reasonably have believed that a
> concerned prospective recipient of the drugs to be delivered by defendant's arrested
> confederates might alert defendant that the delivery was overdue and thus had possibly
> been intercepted.

In this case, Soto-Peguero sent Cabral to deliver a kilogram of heroin to Mejia-Ramos in

Taunton.   She left Norwood at 9:30 pm, and troopers arrested her and seized the heroin at

approximately 10:10 pm.   The travel time between Norwood and Taunton is approximately 40

minutes.   It was not unreasonable for DEA officers to fear that Soto-Peguero might conclude

that Cabral had been arrested when Cabral did not arrive in Taunton, did not return home, and

was unable to communicate with Soto-Peguero.   Soto-Peguero argues that there was no

evidence that the police had been detected, nor that Cabral tried to warn him about her arrest.

These two factors are not dispositive.   It was not unreasonable to conclude that Soto-Peguero

would become increasingly suspicious as time passed without hearing from Cabral.   Soto-Peguero notes that agents were monitoring communications between Soto-Peguero and Mejia-Ramos, but that is imprecise.   They were monitoring Mejia-Ramos's phone.   Had Soto-Peguero reached out to others, including Mejia-Ramos's confederates, the agents would not have known.   Nor would they have known if Soto-Peguero tried to reach out to Cabral.

Additionally, although the agents approached and knocked on the door based on the fear of the destruction of evidence, before they were able to enter into the apartment they were fired upon.   The shooting provided a new and unexpected exigency to secure the apartment.   In *California v. Hodari D*., 499 U.S. 621, 626 (1991), the Supreme Court held that with respect to a seizure based upon an officer's show of authority, no seizure actually occurs for Fourth Amendment purposes until the suspect has submitted to that authority.   Thus, when a defendant dropped crack cocaine during a police chase before police tackled him, the crack could be relied upon to support reasonable suspicion for the stop.   By analogy, in this case, no search occurred until the officers actually entered the apartment.   By that time, one of the defendants had fired a shot at the officers, clearly creating exigent circumstances, not of the officers making.   To challenge the lawfulness of the law enforcement entry based on fears of the destruction of evidence, the defendant was obliged not to fire at the officers before they entered.   By firing, the defendant created a distinct exigency that clearly justified the entry. He cannot now be heard to complain that the entry *would* have been unjustified if he had not fired.

The defendant also contends that the movement of the kilogram of heroin to reveal the presence of the firearm in the heating vent in the front bedroom and the movement of the bag containing the kilogram of heroin in the back bedroom violated the scope of a protective sweep,

which is limited to places a person might be hiding.   First, the defendant suggests that upon the
arrest of Soto-Peguero and Guzman-Ortiz, they had no reason to suspect others might be present.
But the whole purpose of a protective sweep is to insure no one else is present.   Just because
officers initially saw only two people downstairs does not mean that other persons might have
been present upstairs. (Tr. 2 at 29).   Defendant argues the officers had no basis to suspect
another dangerous person was present in the apartment.   Having been fired upon, however,
agents were justified in assuring themselves no additional danger existed. Indeed, it would have
amounted to negligence not to account for the firearm and make certain no one else was present.

The defendant claims the heroin was not in plain view.   Both Detective Sgt. Mahoney
and SA Meletis testified that the heroin package in the front bedroom was in plain view,
"protruding out of the floor vent." (Government Hearing Exhibit Ex. 2 at 10; Tr. 1 at 74;Tr. 2 at
30).

Detective Mahoney did move the heroin to discover the firearm and SA Meletis did move
the bag in the back bedroom to discover the second kilogram of heroin.   Even assuming these
actions were beyond the scope of a protective sweep, there is no Constitutional violation on these
facts.   Defendant argues, rather simplistically, that a person could not be hiding in the heating
vent.   The argument fails for two reasons.   First, having been fired at, the officers were entitled
to account for the presence and location of the firearm to ensure safety.   Second, the discovery
of the firearm and the second kilogram of heroin clearly had no consequence.   The officers had
already observed heroin fall from Soto-Peguero's pockets and observed a kilogram of heroin in
plain view within the apartment, and were clearly going to obtain a search warrant in any event.

On that score, evidence which comes to light by unlawful means nonetheless can be used

at trial if it inevitably would have been revealed in some other lawful way, so long as (1) the

lawful means of its discovery are independent and would necessarily have been employed, (2)

discovery by that means is in fact inevitable, and (3) application of the doctrine in a particular

case will not sully the prophylaxis of the Fourth Amendment. *Nix v. Williams*, 467 U.S. 431, 448

(1984); *United States v. Zapata*, 18 F.3d 971, 978 (1st Cir. 1994); *United States v. Norman*, 638

F. Appx 934, 938 (11th Cir. 2016).

Here, there can be no doubt but that agents would have sought and obtained whether or

not they observed the kilograms of heroin in apartment during the sweep. Too much evidence

had been gathered and too much corroborating conduct on the part of the defendants had been

observed for agents not to believe that Soto-Peguero and Cabral were storing heroin at their 632

Norwest apartment. See, i.e., *United States v. Jadlowe*, 534 F. Supp. 2d 217, 223 (D. Mass.

2008), aff'd, 628 F.3d 1 (1st Cir. 2010).   Moreover, the un-contradicted testimony was that the

DEA planned to stop Cabral and, if they recovered heroin, they planned to freeze the apartment

and seek a federal search warrant. (see, i.e. Tr. 1 at 25).   Nothing in that plan required agents to

"discover" in plain view incriminating evidence to justify the search.   Agents already possessed

sufficient evidence.   Indeed, Cabral had just come from the apartment with a kilogram of heroin

as part of ongoing trafficking activity.   There was no need to seek additional evidence.   Indeed,

it is clear that Detective Mahoney and SA Meletis moved the heroin and the bag in the search for

a weapon.   It is equally clear that there concern for a weapon was a consequence of the shot

fired through the door by Soto-Peguero and his subsequent flight up the stairs.   These actions

made the exigent circumstances more compelling, not less so.

Soto-Peguero contends that he did not hear anyone knock or shout "police" before

officers began to batter the front door.   The officers involved testified that they knocked and

announced at least three times.   This fact is potentially material to the issue of the

reasonableness of the initial entry.   The government submits that there is no reason to discredit

the testimony of Detective Mahoney and SA Meletis that officers knocked and yelled police and

open up.   The testimony was consistent, reasonable, and consistent with standard police

practice.   There is reason to doubt Soto-Peguero's testimony that he did not hear a knock or

yells of police.   He benefits greatly if the evidence is suppressed and the officers credibly

testified that he should have heard the knocks and yells.   Moreover, even if one credits that he

did not hear, it is possible (though unlikely) that the officers did knock and announce but he did

not hear.   Moreover, in the moment, sitting at a table with a kilogram of heroin and loaded

firearm, Soto-Peguero could have initially assumed he was being robbed whether or not he heard

people yell "police." Thus, in reflecting back, he simply may not recall having heard the yells.

In any event, the fact is not material to the issue of inevitable discovery.   In other words, even if

every fact of consequence that occurred after the stop of Cabral is excised from the search

warrant application, it is clear that agents would have sought and received a search warrant for

the apartment.

      Soto-Peguero contends that neither the kilograms of heroin nor the firearm were in plain

view in the bedrooms.   Detective Sgt. Mahoney and SA Meletis testified that the heroin in the

front bedroom was in plain view.   Again, there is no reason to discredit the testimony of the

officers.   Mahoney admitted he moved the heroin to discover the firearm and Meletis admitted

he moved the bag to discover the heroin in the back bedroom.   There is no reason why they

would acknowledge those actions, but deny moving the vent cover.   Moreover, this factual

dispute is not material to the resolution of the motion, because if the discovery of the heroin and firearm is excised from the affidavit in support of the search warrant, there is still overwhelming probable cause to justify the issuance of the warrant. (G. Ex. 3).

## CONCLUSION

For all the foregoing reasons, the defendants' motions to suppress should be denied.

Respectfully submitted,

WILLIAM D. WEINREB
Acting United States Attorney

By:

*/s/ Theodore B. Heinrich*
THEODORE B. HEINRICH
Asst. U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.

*/s/ Theodore B. Heinrich*
THEODORE B. HEINRICH
March 10, 2017                                    Assistant U.S. Attorney