UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CRIMINAL NO. 15-10182-RWZ


UNITED STATES OF AMERICA

v.

ORISTEL SOTO-PEGUERO and
LUIS F. GUZMAN-ORTIZ


MEMORANDUM AND ORDER

May 9, 2017

ZOBEL, S.D.J.

Defendant Oristel Soto-Peguero stands accused of two counts of possession of heroin with intent to distribute, see 21 U.S.C. § 841(a)(1), two counts of conspiracy to distribute and possess with intent to distribute heroin, see 21 U.S.C. §§ 846 and 841(a)(1), and one count of use of a firearm during and in relation to a drug offense, see 18 U.S.C. § 924(c).[1] Defendant Luis F. Guzman-Ortiz is charged with two counts: possession of heroin with intent to distribute, see 21 U.S.C. § 841(a)(1), and with conspiracy to distribute and possess with intent to distribute heroin, see 21 U.S.C. §§ 846 and 841(a)(1). Soto-Peguero has moved to suppress evidence obtained and resulting from wiretaps of two telephones, a car stop, and a sweep of his apartment. See Docket # 118. Guzman-Ortiz joins the motion to the extent it seeks suppression of

---

[1] The First Superceding Indictment also included one count of illegal possession of a firearm in violation of 18 U.S.C. § 922(g)(1) against Soto-Peguero. Soto-Peguero moved to dismiss this count, and the court granted his motion on January 31, 2017. See Docket ## 127 and 132.

evidence from the car stop and from the apartment.  See Docket # 122.[2]  The court

held an evidentiary hearing on January 19 and 20, 2017, and heard the parties'

arguments on April 19, 2017.

## I.    Facts

Based on the credible testimony and consideration of the parties' submissions, I

find the following facts:

### A.    Wiretaps

In late summer 2014, the Drug Enforcement Administration ("DEA") began

investigating a heroin trafficking organization centered in Taunton, Massachusetts, and

operated by Eddyberto Mejia-Ramos.  Starting in mid-January 2015, DEA agents

conducted wiretaps of phones used by Mejia-Ramos.  They began first by intercepting

Target Telephone ("TT") # 1.  The intercepted communications showed that Mejia-

Ramos stopped using TT # 1 around February 4, 2015, and began using TT # 2.

Agents received authorization to intercept TT # 2 on February 24, 2015, and through

intercepted communications, learned that an unknown male, later identified as Jorge

Montalvo, used TT # 3 to supply drugs to Mejia-Ramos.  Mejia-Ramos stopped using

TT # 2 around March 26, 2015, and on April 13, 2015, the court authorized the

interception of TT # 3 and TT # 4, the latter of which Mejia-Ramos was then using.

These interceptions revealed, inter alia, that Soto-Peguero supplied heroin to Mejia-

Ramos and that Mercedes Cabral, on behalf of Soto-Peguero, transported heroin to

---

[2]        At a hearing on the motion to suppress, Guzman-Ortiz said he was joining only with
regard to the search of Soto-Peguero's residence.  See Apr. 19, 2017 Tr. at 6:3–4.  As discussed further
below, Guzman-Ortiz has failed to establish he can challenge this search.

and proceeds from Mejia-Ramos.

**B.    Vehicle Stop**

Insofar as relevant to the instant motion, intercepted communications on July 6, 2015, revealed that Soto-Peguero had planned to transport drugs to Mejia-Ramos that day.  Soto-Peguero called Mejia-Ramos at 1:43 pm, and Mejia-Ramos said, "when I get down there I'm gonna give [you a] call . . . so you can bring that up, because most likely I'll be ready for today."  Suppression Hearing Exhibit 2, at 1.  During that conversation, Soto-Peguero said, "I have a lot of food, try to resolve that, that I have a lot of food around there, I got ready for you."  Id.

Beginning at 6 pm on that day, Special Agent ("SA") Carl Rideout of the DEA and Task Force Officer ("TFO") Christian Theodore[3] conducted surveillance at 632 Norwest Lane in Norwood, Massachusetts.  They observed Cabral leaving the apartment complex in a Hyundai Sonata.  She drove to a grocery store in Boston and returned to the apartment around 8 pm, at which point, she and Soto-Peguero carried groceries into the apartment.  At 8:57 pm, Mejia-Ramos called Soto-Peguero and told him to come by at 10:00 pm and "bring something heavy."  Id. at 2.  Soto-Peguero replied, "I'm going to send the wife/woman." Id.  Soto-Peguero asked, "are you going to clean everything?  So I can send you at least 400?"  Id.  Mejia-Ramos responded, "Not 10. Yeah, is to clean everything."  Id.

At approximately 9:34 pm, Cabral left the apartment again.  Soto-Peguero called Mejia-Ramos at 9:38 pm and said, "[t]he woman is on her way.  She should be there in

---

[3]       Officer Theodore testified that he is a detective trooper with the Massachusetts State Police who is assigned to the DEA as a "task force agent."  Jan. 19, 2017 Tr. at 50:21–51:6.  He explained that as a task force agent, he "basically control[s] [his] own cases as well as assist[s] agents with their cases for the control of possible DTO, drug-trafficking organization, in Bristol County specifically."  Id. at 51:8–10.

20 minutes, half an hour." Id. at 3.  Rideout, Theodore, and two other officers followed Cabral as she drove onto Route 24 South and then onto Route 44 West toward Taunton.  TFO Theodore contacted Massachusetts State Police ("MSP") Troopers Ryan Walczak and Jason Vital and requested that they conduct a traffic stop.

At approximately 10:10 pm, Trooper Vital stopped Cabral for a marked-lane violation.  Trooper Walczak and Trooper Andy Mason joined Vital shortly after the stop. TFO Theodore, SA Rideout, and Bristol County Sheriff's Office Major Nelson Degouveia observed the stop from a nearby gas station.  The three MSP troopers approached the car and asked Cabral to produce her license and registration.  Cabral said that she could not locate her license and gave Trooper Vital the rental agreement, on which she was not listed as a driver.  At the time, Cabral's license was suspended, which Theodore had learned prior to the stop and had communicated to the troopers. Trooper Walczak asked Cabral to exit the vehicle.  Cabral attempted to take her purse and phone with her, but Vital told her to leave them in the car.  At that point, Cabral handed the purse to Vital, and Walczak placed her under arrest.[4]  A vehicle inventory revealed that her pocketbook contained a large object wrapped in green plastic.  Inside the plastic wrapping were several brick like substances, each about the size of a bar of

---

[4]        This account is based on Trooper Walczak's report, which says that Cabral was arrested because of the suspended license and being an unauthorized operator of the vehicle.  See Docket # 119-5, at 2.  According to TFO Theodore's report, Cabral's pocketbook was located on the front passenger seat, and she was arrested after officers observed that it contained ten square shaped blocks wrapped in gauze and green plastic wrap, wrapping that is consistent with narcotics packaging.  See Docket # 119-4, at 3.  At the suppression hearing, Theodore maintained that Cabral was arrested for the drug offense. Jan. 19, 2017 Tr. at 57:18–23.  As to the progression of events, Theodore testified that after Cabral was taken out of the vehicle, the pocketbook was left on the trunk of the car.  Id. at 56:6–7.  He stated that Vital handled the pocketbook, but prior to Vital opening it, he could see green cellophane wrapping.  Id. at 56:11–18.  Theodore also said that after Vital opened the pocketbook he could see "eight to ten blocks of cellophane wrap."  Id. at 57:4–5.

soap, which according to Walczak, was consistent with how heroin was packaged and stored.  The pocketbook also contained $501.00 in cash.

### C.    Evidence from 632 Norwest Lane

Soon after the seizure from the vehicle, at approximately 10:13 pm, about eleven officers surrounded Soto-Peguero's home at 632 Norwest Lane in Norwood, a two-bedroom, two-story, attached condominium.  There was a light on downstairs.  One officer knocked several times on the front door, yelling "police,"  After no one answered, Detective Kevin Mahoney of the Dedham Police Department[5] tried to breach the door using a ram.  He unsuccessfully rammed the door four or five times, after which, he heard a gun shot and saw a hole in the door.  His final attempt to open the door failed.  At about this time, he noticed two people looking out from the top-floor window.

When the front door proved to be invincible, officers in the back of the unit made a forced entry through the rear door and opened the front door for the officers in that location.  After their entry, the officers conducted a protective "sweep" of the residence. See, e.g., Jan. 19, 2017 Tr. at 94:15–16; Jan. 20, 2017 Tr. at 29:24–30:1.  Two men who were upstairs came down.  As the first individual, Soto-Peguero, came down the stairs on his stomach as directed, a package containing three bags of a tan brown substance fell from his pants.  The second individual, Guzman-Ortiz, then descended in like fashion, and the officers arrested both.  During the "sweep" of the apartment, the officers uncovered a block of heroin and a firearm in the front bedroom and a block of heroin in the back bedroom.

---

[5]        Mahoney was assisting the DEA as part of the Norfolk County Anti-Crime Task Force.

The next day, on July 7, 2015, SA Rideout obtained a search warrant to search the premises, which was executed that same day.  During that search, officers found additional items including bags of heroin and ammunition.

## II. Analysis

Soto-Peguero moves to suppress all wiretap communications intercepted on TT ## 2 and 4, all evidence seized during the vehicle stop, all evidence seized from 632 Norwest Lane, and any evidence derived either directly or indirectly from this evidence.

### A. Wiretaps

Soto-Peguero argues for the suppression of the evidence and fruits obtained from the interception of TT ## 2 and 4 on the grounds that the government did not try less intrusive alternatives before applying for the orders authorizing these interceptions. He contends that while the government tried using three cooperating sources before seeking to intercept TT # 1, it did not do likewise before applying for authorization to intercept TT ## 2 and 4.  Further, he says, the applications for these orders do not include any reasons why these less intrusive procedures were unlikely to succeed or would be too dangerous.

Under 18 U.S.C. § 2518, "[e]ach application for an order authorizing or approving the interception of a wire, oral, or electronic communication . . . shall include," inter alia, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  This showing has been referred to as the "necessity" requirement for a wiretap order.  See United States v.

6

Meléndez-Santiago, 644 F.3d 54, 57 (1st Cir. 2011).

"Th[e] language [of § 2518] . . . is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." United States v. Kahn, 415 U.S. 143, 153 n.12 (1974) (citing S. Rep. No. 1097, 90th Cong., 2d Sess. 101); see also United States v. Ashley, 876 F.2d 1069, 1072 (1st Cir. 1989). "Prior to granting authorization for a wiretap, the issuing court 'must satisfy itself that the government has used normal techniques but it has encountered difficulties in penetrating a criminal enterprise or in gathering evidence — to the point where (given the statutory preference for less intrusive techniques) wiretapping becomes reasonable.'" Ashley, 876 F.2d at 1072 (quoting United States v. Abou-Saada, 785 F.2d 1, 11 (1st Cir. 1986)). The government does not need to "show that other methods have been wholly unsuccessful," nor is it required "to run outlandish risks or to exhaust every conceivable alternative before requesting authorization for electronic surveillance." Id. A court reviewing a wiretap order "examine[s] the face of the affidavit and 'decide[s] if the facts set forth in the application were minimally adequate to support the determination that was made.'" United States v. Nelson-Rodriguez, 319 F.3d 12, 32 (1st Cir. 2003) (quoting Ashley, 876 F.2d at 1074).

Here, the government made a sufficient showing to justify the intercept orders for TT ## 2 and 4. The application for authorization to intercept communications over TT # 1 — which defendant does not challenge —  detailed how the DEA had used various investigative techniques, including three confidential sources ("CS"), surveillance, trash pulls, and an analysis of telephone records. Docket # 119-9, at 14–29. In his affidavit, SA Rideout gave two main reasons why "[t]he continued use of controlled buys and

surveillance [was] unlikely to be any more successful":

> First, the nature of controlled buys by confidential informants is unpredictable and limited.  Like most confidential sources, the CSs utilized in this investigation are drug users who[] lead unstable lives.  They are afraid of the targets and unwilling to be recorded, to testify, or to be identified.  Moreover, the CSs typically deal only with one or two people within the [drug trafficking organization] and [are] unable to buy from anyone else without raising suspicion and triggering security concerns.  Thus, they cannot advance the investigation beyond what has already been revealed.  The second main reason is that CS controlled buys and surveillance are insufficient proof of the scope of the activity involved.  Without recordings and a witness willing to testify, the buys only establish probable cause, not evidence to convict beyond a reasonable doubt, of the distributions at issue.  More importantly, these particular distributions represent only an extraordinarily small slice of the criminal activity under investigation.

Id. at 32–33.  He then detailed why continuing to use the three CSs with whom they had been working would not be effective without electronic surveillance and why using undercover agents would likely not be successful.  Id. at 34–35.  Rideout also attested that he did not "know of anyone else who is both in a position to effectively cooperate against the targets of this investigation and willing to do so."  Id. at 35.

The application for authorization to intercept communications over TT # 2 discussed the information obtained from the interceptions of TT # 1 and stated that around February 3, 2015, Mejia-Ramos began using TT # 2 as a replacement phone for TT # 1.  See Docket # 119-10, at 23; Docket # 119-11, at 3–4.  Rideout referenced the application for TT # 1's interception and detailed the techniques law enforcement had used in the investigation.  Docket # 119-11, at 7–8.  He then explained why interception of TT # 2 was necessary.  This explanation "largely repeat[s] [his] prior affidavit because [the reasons] still apply and are modified only by the results of the

interceptions of TT # 1, which substantiate the value of the interceptions occurring over phones used by MEJIA-RAMOS." Id. at 9.

Similarly, in the application to intercept communications from TT # 4, Rideout said that there was probable cause to believe Mejia-Ramos was using TT # 4 as a replacement for TT # 2.  He attested that "although interceptions over TT #1 and replacement phone TT #2 have been exceedingly productive, [he] and other investigators have yet to fully identify the range of MEJIA-RAMOS's customers, the location of the stash houses of him and his associates, and how they are laundering their drug proceeds. Without interception over replacement phone TT #4, it will be difficult if not impossible to accomplish these goals."  Docket # 119-13, at 17.  Rideout then again supported his conclusion that other techniques would be too risky or unsuccessful by incorporating the information from the original application, "modified only by the results of the interceptions of TT #1 and TT #2, which substantiate the value of the interceptions occurring over phones used by MEJIA-RAMOS, including TT #4." Id. at 18.

To the extent Soto-Peguero suggests that the government should have re-tried the same measures or tried new ones each time Mejia-Ramos changed phones, this argument is unavailing.  The applications for the intercept orders for TT ## 2 and 4 explained that the circumstances discussed in TT # 1 "still appl[ied]" and so using CSs and other technique at this point in the investigation would not have been successful. Docket # 119-11, at 9; Docket # 119-13, at 18.  "An application for electronic surveillance need not be based on proof positive that, without electronic assistance, a promising investigation is up a blind alley.  It is enough that reasonable efforts to

succeed without such assistance have been tried and failed, and that electronic surveillance seems a suitable next step in a plausible progression." <u>United States v. David</u>, 940 F.2d 722, 729 (1st Cir. 1991); <u>see also</u> <u>Nelson-Rodriguez</u>, 319 F.3d 33 ("There is no rule on the amount of time investigators must try and fail, using other methods, before turning to a wiretap application."). Given the information detailed in the application to intercept the communications over TT # 1, SA Rideout's explanation suffices to establish that the government made "a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls." <u>United States v. López</u>, 300 F.3d 46, 52 (1st Cir. 2002) (quoting <u>United States v. Hoffman</u>, 832 F.2d 1299, 1306–07 (1st Cir. 1987)).[6]

### B. Vehicle Stop

Next, Soto-Peguero contends that the heroin obtained from the car stop should be suppressed. However, "[b]efore a court may reach the merits of a motion to suppress, 'the defendant carries the burden of establishing that he had a reasonable expectation of privacy with respect to the area searched or . . . the items seized.'" <u>United States v. Rodríguez-Lozada</u>, 558 F.3d 29, 37 (1st Cir. 2009) (quoting <u>United</u>

---

[6]      Soto-Peguero cites <u>United States v. Gonzalez, Inc.</u>, 412 F.3d 1102 (9th Cir. 2005), <u>amended on denial of reh'g</u>, 437 F.3d 854 (9th Cir. 2006), for the proposition that "the government is not free to transfer a statutory showing of necessity from one application to another — even within the same investigation," <u>id.</u> at 1115. However, this case is inapposite. In <u>Gonzalez</u>, the government relied on investigative work leading up to the wiretap order for telephones in bus terminals in Phoenix and Tuscan, Arizona ("Terminal wiretap"), in an application for a wiretap of an office in Los Angeles, California ("Blake Avenue wiretap"). <u>See</u> <u>id.</u> at 1106–08, 1115. There, the Ninth Circuit held that the government failed to establish necessity for the Blake Avenue wiretap, and it could not transfer the showing of necessity from the Terminal wiretap application to the Blake Avenue wiretap application. <u>Id.</u> at 1115. By contrast, here, the government demonstrated necessity for the TT # 1 intercept order and then explained why the circumstances that applied to TT # 1 continued to apply when Mejia-Ramos substituted TT ## 2 and 4 for TT # 1.

States v. Lipscomb, 539 F.3d 32, 35–36 (1st Cir. 2008)).  "Although the threshold requirement is referred to as standing, it is more properly considered under a Fourth Amendment analysis."  Id.  When determining whether a defendant had a reasonable expectation of privacy, a court considers "first, whether the movant has exhibited an actual, subjective, expectation of privacy; and second, whether such subjective expectation is one that society is prepared to recognize as objectively reasonable." United States v. Rheault, 561 F.3d 55, 59 (1st Cir. 2009).

Here, Soto-Peguero claims he had a reasonable expectation of privacy in the Hyundai Sonata that Cabral was driving because he drove the vehicle regularly and it was rented for his benefit.  He submitted an affidavit that states, "I asked Johnathan Pimentel to rent the Hyundai Sonata in his name, but exclusively for my personal benefit and use.  In exchange, I paid Johnathan $400 to do so.  Mercedes Cabral could only use the Sonata with my permission."  Docket # 126-1, at 14.  The affidavit also includes that Soto-Peguero "always kept [his] clothing in the Hyundai.  When the police impounded the car, [his] clothes were contained in a bag in the backseat."  Id.  At the suppression hearing, Soto-Peguero testified that he asked Pimentel to rent the vehicle for him "[b]ecause [he] didn't have a license at the moment."  Jan. 20, 2017 Tr. 57:14.

The circuit courts are divided regarding a defendant's reasonable expectation of privacy when the defendant is an unauthorized driver of a rental car.  See United States v. Thomas, 447 F.3d 1191, 1196-99 (9th Cir. 2006) (explaining that the Fourth, Fifth, and Tenth Circuits "have all adopted a bright-line test: An individual not listed on the rental agreement lacks standing to object to a search," the Eighth Circuit "generally disallows standing unless the unauthorized driver can show he or she had the

permission of the authorized driver," and the Sixth Circuit "examines the totality of the

circumstances," and then ultimately joining the Eighth Circuit, holding that "[a]n

unauthorized driver may have standing to challenge a search if he or she has received

permission to use the car"); see also United States v. Walton, 763 F.3d 655, 662 (7th

Cir. 2014) (explaining that it has previously held that an unlicensed and unauthorized

driver "lack[s] standing to challenge a search of the rented car," and leaving the

"question of whether an unauthorized, properly licensed driver of a rental car enjoys

standing . . . for another day"); United States v. Kennedy, 638 F.3d 159, 167 (3d Cir.

2011) ("[W]e join the majority of circuits in concluding that the lack of a cognizable

property interest in the rental vehicle and the accompanying right to exclude makes it

generally unreasonable for an unauthorized driver to expect privacy in the vehicle.").

 However, the current situation is one step removed from this split.  Soto-Peguero

was not driving the car at the time of the stop.  Therefore, not only is he not the owner

of the car or the renter of the car, but — even assuming an unauthorized driver of a

rental car has a reasonable expectation of privacy — he was not the driver of the car.

While Soto-Peguero may have had a subjective expectation of privacy in the car when

Cabral drove it, this is not a legally allowable expectation of privacy.  Cf. Rakas v.

Illinois, 439 U.S. 128, 143 n.12 (1978) ("[A] 'legitimate' expectation of privacy by

definition means more than a subjective expectation of not being discovered.  A burglar

plying his trade in a summer cabin during the off season may have a thoroughly justified

subjective expectation of privacy, but it is not one which the law recognizes as

'legitimate.'  His presence, in the words of Jones [v. United States, 362 U.S. 257, 267

(1960)], is 'wrongful' his expectation is not 'one that society is prepared to recognize as

"reasonable."'" (quoting Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J.,

concurring))).  Accordingly, Soto-Peguero cannot object to the vehicle search.

### C.    Evidence from 632 Norwest Lane

Finally, Soto-Peguero claims that the drugs and the firearm recovered from his

residence should be suppressed.

As a preliminary issue, Guzman-Ortiz seeks to join Soto-Peguero's motion to

suppress evidence found at the apartment.  However, at the suppression hearing,

Guzman-Ortiz offered no evidence of a reasonable expectation of privacy in the areas

searched.  When asked directly about this issue at the April 19 hearing, Guzman-Ortiz

argued that he was related to Soto-Peguero and an invited guest.  See Apr. 19, 2017

Tr. at 25:2–15.  If Guzman-Ortiz were an overnight guest, then he may be able to claim

that he had a reasonable expectation of privacy.  See Minnesota v. Olson, 495 U.S. 91,

98-100 (1990).  But no such evidence was ever proffered.  Indeed, he offered no

evidence at all.  Soto-Peguero testified (in response to questions by the government)

that Guzman-Ortiz "was going — I don't know he was stay [sic] 100 percent, but he

probably would have stayed over.  He probably was going to stay over just for the

night."  Jan. 20, 2017 Tr. 80:1–3.  Guzman-Ortiz asked no additional questions and

provided no additional evidence on the issue.   "[F]ailure to present evidence with

respect to such an expectation prevents a defendant from making a claim for

suppression under the Fourth Amendment."  Rodríguez-Lozada, 558 F.3d at 37

(alternation in original) (quoting United States v. Samboy, 433 F.3d 154, 162 (1st Cir.

2005)).  Therefore, Guzman-Ortiz has not established that he had a reasonable

expectation of privacy in Soto-Peguero's apartment.  His motion to suppress is denied,[7] and I reach the merits of the motion to suppress evidence from 632 Norwest Lane only with regard to Soto-Peguero.

### 1.    Warrantless Entry

Soto-Peguero argues that no exigent circumstances justified the warrantless entrance into 632 Norwest Lane.

"[W]arrantless searches of a dwelling-place are presumptively unreasonable unless the police can prove consent or the existence of exigent circumstances."  United States v. Curzi, 867 F.2d 36, 41 (1st Cir. 1989).  "Exigent circumstances exist where 'there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant.'"  Fletcher v. Town of Clinton, 196 F.3d 41, 49 (1st Cir. 1999) (quoting United States v. Almonte, 952 F.2d 20, 22 (1st Cir. 1991)).  "Such exigent circumstances arise when, inter alia, the police have a reasonable fear that a person would destroy drug evidence unless the person's premises are secured."  United States v. St. Pierre, 488 F.3d 76, 79 (1st Cir. 2007).  "The government bears the burden of proving exigent circumstances."  Samboy, 433 F.3d at 158.

Here, the government claims that exigent circumstances existed because Soto-Peguero may have destroyed evidence.  Specifically, it maintains that Soto-Peguero may have suspected Cabral was arrested.  The government says that Cabral "left Norwood at 9:30 pm, and troopers arrested her and seized the heroin at approximately

---

[7]        Because the ultimate disposition of this case is denying Soto-Peguero's motion on the merits, Guzman-Ortiz's lack of a reasonable expectation of privacy makes no practical difference under these circumstances.

10:10 pm.  The travel time between Norwood and Taunton is approximately 40 minutes. It was not unreasonable for DEA officers to fear that Soto-Peguero might conclude that Cabral had been arrested when Cabral did not arrive in Taunton, did not return home, and was unable to communicate with Soto-Peguero."  Docket # 123, at 27–28; see also Jan. 20, 2017 Tr. at 47:23–49:21 (SA Rideout testimony about fearing destruction of evidence).  The government further argues that no search had occurred at the point a shot was fired, and that "[b]y firing, the defendant created a distinct exigency that clearly justified the entry."  Docket # 123, at 28–29.

Soto-Peguero counters that the government manufactured these exigent circumstances.  He claims that the government should have obtained a warrant prior to stopping Cabral, and that "[t]he officers unreasonably delayed in seeking a warrant after they learned at about 1:40 p.m. that Mr. Soto-Peguero had 'a lot of food' for Mr. Mejia-Ramos."  Docket # 142, at 11.  Soto-Peguero notes that if — as the government has maintained — there was probable cause to search the automobile, then the officers had probable cause to get a warrant prior to the vehicle stop.  See Apr. 19, 2017 Tr. at 19:15–20:16.

The government's explanation for why it failed to get a warrant seems to be that the plan was a "contingent" one: if the police found heroin during the car stop, then officers would freeze the apartment in order to preserve the status quo until they obtained a warrant.  See, e.g., Apr. 19, 2017 Tr. at 10:23, 14:8–15:13.  SA Rideout testified that the officers waited to obtain a warrant until after the vehicle stop because "basically it was to make sure we had a seizure of narcotics from the location before we applied for the warrant."  Jan. 19, 2017 Tr. at 48:12–13.  DEA SA Meletis testified (on

15

cross-examination) that he was unaware of any consideration about getting a warrant prior to the vehicle stop "because [he and SA Rideout] didn't know how it was going to turn out. The majority of times that we're involved in incidents like this, I would say more than half the time, things really don't develop. So you just kind of try to plan ahead as best as you can." Jan. 20, 2017, Tr. at 37:12–16. He then acknowledged that after 1:30 pm, he "potentially" could have obtained a warrant. Id. at 37:19. The government also implies that officers could not monitor Soto-Peguero from outside of the apartment because their presence would have been revealed. See Apr. 19, 2017 Tr. at 11:7–24; see also Jan. 20, 2017 Tr. at 20:22–21:10 (SA Meletis testifying that no one had a view of the back door of the apartment "because of the way the apartment complex was configured. It was like a courtyard and there was a fence that was essentially blocking one of the areas to get back in. It didn't make it feasible to get in there without potentially being compromised.").

I find that Cabral's failure to return and being unreachable "gave rise to a reasonable belief that [Soto-Peguero] probably would have realized the police were closing in and begun disposing of evidence had the police waited to obtain a search warrant at the time of [Cabral]'s arrest." Samboy, 433 F.3d 159 (affirming the district court's finding of exigent circumstances where, at the time police enter defendant's apartment, "the police knew that [defendant] was present, that he had recently sent [his courier] to deliver drugs, and that [the courier] had been arrested and therefore had not returned or contacted [defendant]"). As to defendant's argument that the government should have obtained a warrant after the 1:43 pm call between Mejia-Ramos and Soto-Peguero where Mejia-Ramos said "most likely I'll be ready for today," there is a

16

question as to whether the police indeed had probable cause to seek a warrant at that

point.  Compare United States v. Beltran, 917 F.2d 641, 642 (1st Cir. 1990) (finding that

defendant's "prior dealings with the informant, [a] 4:20 p.m. phone call [where

defendant told the informant to go to her apartment at 7:30 p.m. for the purpose of

purchasing one pound of cocaine for $1,100 per ounce, and] her completed two ounce

sale the previous day[] was more than sufficient to justify issuance of a search

warrant"), with Samboy, 433 F.3d at 160 (finding that "[t]he police could reasonably

conclude it was doubtful that [a call between defendant and cooperating witness]

established probable cause" when "[a]t that time, [defendant] had not agreed to the

transaction, and had indicated that he didn't have the drugs with him").  Although the

government does argue that the officers had probable cause after the 9:38 pm phone

call, where Soto-Peguero told Mejia-Ramos that "[t]he woman is on her way,"[8] and

Cabral began her trip from Norwood, the government does not appear to be arguing

that there was probable cause at 1:43 pm.  See Docket # 123, at 22–23.

However, even assuming the police had sufficient probable cause such that they

could have obtained a warrant earlier in the day, the government here is saved by case

law that nonetheless allows it to rely on exigent circumstances.  See Kentucky v. King,

563 U.S. 452, 466–67 (2011) (explaining that "[t]here are many entirely proper reasons

why police may not want to seek a search warrant as soon as the bare minimum of

evidence needed to establish probable cause is acquired," and that "[f]aulting the police

---

[8]        There was also an 8:57 pm phone call between Soto-Peguero and Mejia-Ramos where
Soto-Peguero said he would send the "wife/woman" by 10:00 pm, and they discussed quantity and prices.
Hearing Exhibit 2.

for failing to apply for a search warrant at the earliest possible time after obtaining probable cause imposes a duty that is nowhere to be found in the Constitution"); see also Samboy, 433 F.3d at 160 ("There is no legal rule requiring the police to seek a warrant as soon as probable cause likely exists to seek a warrant.").  "Nor does the fact that in [stopping Cabral on her way to Mejia-Ramos] the police might have foreseen the eventual entry into [Soto-Peguero]'s apartment, standing alone, prevent application of the exigent circumstances doctrine."  Samboy, 433 F.3d at 160; see also King, 563 U.S. at 464–65 (rejecting a "reasonable foreseeability test" under which the police cannot rely on exigent circumstances if "it was reasonably foreseeable that the investigative tactics employed by the police would create the exigent circumstances" (quoting King v. Commonwealth, 302 S.W.3d 649, 656 (Ky. 2010))).  Under the facts of this case, exigent circumstances justified securing the apartment prior to obtaining a warrant.

## 2.    Protective Sweep

Soto-Peguero maintains that even if the officers could lawfully enter his residence, "the officers' subsequent decision to search under the auspices of conducting a 'protective sweep' is unsustainable."  Docket # 119, at 17.

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.  It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding."  Maryland v. Buie, 494 U.S. 325, 327 (1990).  This sweep, "aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found.  The sweep lasts no longer than is necessary to dispel the

reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Id. at 335–36 (footnote omitted).

I am not persuaded by the officers' account that a block of heroin was sticking out of a floor vent in the front bedroom. Compare Jan. 19, 2017 Tr. at 74:8-10 (government testimony that the block was sticking out of the floor vent), and Jan. 20, 2017 Tr. 30:24–31:1 (same), with Jan. 20, 2017 Tr. at 61:11-65:23 (Soto-Peguero testimony that he placed a shirt, gun, and drugs into the vent and then put the cover of the vent back on). Nor do I resolve the conflicting evidence as to whether a bag in the back bedroom containing heroin was in a drawer or next to the bed. Compare Jan. 20, 2017 Tr. at 32:3-6 (government testimony that there was black plastic bag next to the bed), with Jan. 20, 2017 at 69:18-23 (Soto-Peguero testimony that the bag of drugs was in a drawer). However, even accepting the government's version of events as true, manipulating an object in a vent and opening a bag goes beyond the scope of a protective sweep. These are not locations where a person could be hiding. See Buie, 494 U.S. at 327. Indeed, the government eventually conceded that the officers "probably" should not have moved objects in these areas. See Apr. 19, 2017 Tr. at 17:15–22.

Nevertheless, suppression of this evidence is not appropriate, as it would have been inevitably discovered. Cf. United States v. Zapata, 18 F.3d 971, 978 (1st Cir. 1994). "Evidence which comes to light by unlawful means nonetheless can be used at trial if it ineluctably would have been revealed in some other (lawful) way, . . . so long as (I) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the

19

doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment." Id. (citations omitted).

Here, the officers were securing the apartment until they obtained a search warrant, which they did the following morning. I credit their testimony to this effect and find that they would have sought a warrant even had they not found the firearm and drugs in the apartment. Cf. United States v. Almeida, 434 F.3d 25, 29 (1st Cir. 2006). Further, the officers had sufficient probable cause by the time they began the protective sweep to obtain a warrant without the evidence they found at the apartment. Cf. Beltran, 917 F.2d at 642–43. And they would have found this evidence upon the execution of the search warrant. Accordingly, the government has "demonstrate[d], to a high degree of probability, that the evidence would have been discovered." Almeida, 434 F.3d at 29. Though the officers should not have searched in the vent or in the bag, allowing this evidence to come in does not "sully the prophylaxis of the Fourth Amendment," Zapata, 18 F.3d at 978. "Such an analysis necessarily dwells closely on the facts of a particular case." United States v. Scott, 270 F.3d 30, 45 (1st Cir. 2001). Under the facts of this case, applying the inevitable discovery rule to allow admission of these pieces of evidence is unlikely to "erode [Fourth Amendment] protections or encourage police misconduct," Almeida, 434 F.3d at 29; cf. Nix v. Williams, 467 U.S. 431, 445–46 (1984). Therefore, here, "the deterrence rationale does not justify putting the police in a worse position than they would have been had no misconduct occurred." United States v. Silvestri, 787 F.2d 736, 740 (1st Cir. 1986).

**III.   Conclusion**

Defendant Soto-Peguero's Motion to Suppress (Docket # 118) and defendant

Guzman-Ortiz's Motion to Suppress (Docket # 122) are both DENIED.


_____May 9, 2017_____      _____/s/Rya W. Zobel_____
DATE                 RYA W. ZOBEL
              SENIOR UNITED STATES DISTRICT JUDGE